**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 21-1697**

───────────────

JERRY DAVIDSON, individually and on behalf of others similarly situated,

Plaintiff - Appellant,

v.

UNITED AUTO CREDIT CORPORATION, a California corporation,

Defendants - Appellee.

----------------------------------------------------

UNITED STATES OF AMERICA,

Amicus Supporting Appellant.

REP. ANDY BARR, (R-KY, 6th Dist.); SENATOR NORM COLEMAN, (R-MN, 2003-2009); REP. BARRY LOUDERMILK, (R-GA, 11th Dist.); REP. JEFF MILLER, (R-FL, 1st Dist., 2001-2017); REP. PETE SESSIONS, (R-TX, 17th Dist.); REP. WILLIAM TIMMONS, (R-SC, 4th Dist.); REP. JOE WILSON, (R-SC, 2nd Dist.); AMERICAN FINANCIAL SERVICES ASSOCIATION; CONSUMER BANKERS ASSOCIATION; GUARANTEED ASSET PROTECTION ALLIANCE; NATIONAL AUTOMOBILE DEALERS ASSOCIATION; CONSUMER CREDIT INDUSTRY ASSOCIATION; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA,

Amici Supporting Appellee.

───────────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Leonie M. Brinkema, District Judge.  (1:20–cv–01263–LMB–JFA)

───────────────

Argued:  October 26, 2022                    Decided:  April 12, 2023

---

Before WILKINSON, THACKER, and RICHARDSON, Circuit Judges.

---

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Thacker joined.  Judge Wilkinson wrote an opinion dissenting.

---

**ARGUED:**  Jennifer D. Bennett, GUPTA WESSLER PLLC, San Francisco, California, for Appellant.  Stacy Delayne Blank, HOLLAND & KNIGHT LLP, Tampa, Florida, for Appellee.  Anna O'Neil Mohan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus United States of America.  **ON BRIEF:** Janet R. Varnell, Brian Warwick, VARNELL & WARWICK, P.A., Tampa, Florida; Leonard Anthony Bennett, CONSUMER LITIGATION ASSOCIATES, P.C., Newport News, Virginia; Jessica Garland, San Francisco, California, Deepak Gupta, GUPTA WESSLER PLLC, Washington, D.C.; Kristi Cahoon Kelly, KELLY GUZZO PLC, Fairfax, Virginia; Tina Wolfson, Christopher Eric Stiner, AHDOOT & WOLFSON P.C., Burbank, California, for Appellant.  Travis A. Sabalewski, Tysons, Virginia, Raymond Y. Kim,  HOLLAND & KNIGHT LLP, Los Angeles, California, for Appellee.  Brian M. Boynton, Acting Assistant Attorney General, H. Thomas Byron, III, Dennis Fan, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Carolina D. Krass, General Counsel, Paul S. Koffsky, Acting Principal Deputy General Counsel, Rita P. Davis, Deputy General Counsel, UNITED STATES DEPARTMENT OF DEFENSE, Washington, D.C.; Jessica D. Aber, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Richmond, Virginia; Seth Frotman, Acting General Counsel, Steven Y. Bressler, Acting Deputy General Counsel, Laura Hussain, Assistant General Counsel, Ryan Cooper, CONSUMER FINANCIAL PROTECTION BUREAU, Washington, D.C., for Amicus United States.  Marci B. Kawski, Madison, Wisconsin, Lisa M. Lawless, HUSCH BLACKWELL LLP, Milwaukee, Wisconsin, for Amici The American Financial Services Association, Consumer Bankers Association, Guaranteed Asset Protection Alliance, National Automobile Dealers Association, Consumer Credit Industry Association, and Chamber of Commerce of the United States of America.  John C. Redding, Charlotte, North Carolina, Sam Bragg, Dallas, Texas, Lane Zuraw, ALSTON & BIRD LLP, San Francisco, California, for Amici Seven Current or Former Members of Congress.

---

RICHARDSON, Circuit Judge:

The Military Lending Act regulates lenders when they extend "consumer credit" to members of the military. Yet the Act makes an exception. If the loan is "procured in the course of purchasing a car . . . when that loan is offered *for the express purpose* of financing the purchase and is secured by the car" then it is not "consumer credit." 10 U.S.C. § 987(i)(6) (emphasis added). So if a member of the military takes out a secured loan to purchase a car, then the exception is satisfied and the Act does not apply. But what happens when the loan finances both the car and some related costs? Is the statute's exception contingent on the loan financing solely the purchase of the car—i.e., is the dual-purpose loan no longer offered *for the express purpose* of financing the car? The district court said no and we agree. If a loan finances a car and related costs, then it is for the express purpose of financing the car purchase and the exception can apply.

## I.      Background

The facts here are brief and straightforward. Jerry Davidson was on active duty with the United States Army.[1] He bought a car from Select Cars of Thornburg in Fredericksburg, Virginia, and financed his purchase with a loan from United Auto Credit Corporation. The loan financed not only the car's cost, but also the cost of Guaranteed

---

[1] Reviewing a district court's decision to dismiss the complaint under Civil Rule of Civil Procedure 12(b)(6), we "must accept as true all of the factual allegations contained in the complaint" as well as "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 440 (4th Cir. 2011). And we may consider attached documents so long as they are integral to the complaint and authentic. *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012).

Asset Protection. Guaranteed Asset Protection is like extra insurance, covering any amount still due on the car loan after auto insurance is paid out if the car is totaled or stolen.[2] Davidson's claims arise from this single loan.

This loan, Davidson alleges, violated the Military Lending Act because the loan agreement mandated arbitration and failed to disclose certain information. The district court dismissed the case, holding that the loan was not covered by the Act at all. The Act applies only to "consumer credit" loans. And the district court reasoned that Davidson's loan was not "consumer credit" because the Act's car-loan exception was satisfied. On appeal, Davidson argues that the exception was not satisfied so the Act applies to his loan.

## II.    Discussion

United Auto's loan to Davidson is not covered by the Act. If, among other things, a loan is given "for the express purpose" of financing a car purchase, then the Act excludes the loan. § 987(i)(6). "For the express purpose," as used in the Act, means for the *specific* purpose. So a loan whose specific purpose is financing a car purchase still satisfies the § 987(i)(6) exception even if it has other purposes. One might alternatively read "for the express purpose" to mean for the *sole* purpose, leading to the opposite result. But context shows that is not the best reading. Since United Auto's loan to Davidson had the specific purpose of financing Davidson's car purchase and met § 987(i)(6)'s other requirements, it

---

[2] The litigation has focused on financing the Guaranteed Asset Protection. The complaint also alleges that the loan here included a processing fee and a prepaid-interest fee. But those fees do not affect our analysis.

is outside the Act's coverage. We explain each step below, stopping first to explore the Act's framework.

## A.    Understanding the Statutory and Regulatory Framework

The Military Lending Act's requirements apply only to the "extension of consumer credit" to a "covered member."[3] Davidson has adequately alleged that he was a covered member when he obtained the loan from United Auto.[4] So United Auto's loan to him is governed by the Act if it qualifies as "consumer credit."

The loan certainly falls within the general "consumer credit" definition. *See* 32 C.F.R. § 232.3(f)(1) (defining "consumer credit" as "credit offered or extended to a covered borrower primarily for personal, family, or household purposes, and that is: (i) subject to a finance charge; or (ii) payable by a written agreement in more than four installments.").[5] But this general definition of "consumer credit" is subject to an exception

---

[3] *See* 10 U.S.C. § 987(c)(1) ("With respect to any extension of consumer credit (including any consumer credit originated or extended through the internet) to a covered member or a dependent of a covered member, a creditor shall provide . . . ."); 10 U.S.C. § 987(e) ("It shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which . . . .").

[4] "Covered members" are members of the armed forces who are either "on active duty under a call or order that does not specify a period of 30 days or less" or who are "on active Guard and Reserve Duty." 10 U.S.C. § 987(i)(1). Additionally, Davidson has adequately alleged that he is a dependent of a covered member, which also brings him under the Act's coverage. *See* 10 U.S.C. §§ 987(i)(2), 1072(2)(A) (defining "dependent" to include "the spouse" of a covered member).

[5] The Act defines "consumer credit" as what is "provided . . . in regulations" by the Department of Defense. 10 U.S.C. § 987(i)(6). The Department of Defense promulgated 32 C.F.R. § 232.3(f)(1) under § 987(i)(6) through notice-and-comment rulemaking. Davidson's loan qualifies under the agency's criteria: it was made in writing; for personal, (Continued)

for car loans: "The term 'consumer credit' . . . does not include . . . (B) a loan procured in the course of purchasing a car[,] when that loan is offered for the express purpose of financing the purchase and is secured by the car . . . procured." § 987(i)(6).[6]  Thus, a loan is excluded from the Act if it was:  (1) "procured in the course of purchasing a car"; (2) "offered for the express purpose of financing the purchase" of that car; and (3) "secured by the car."  *Id.*

Davidson's appeal hinges on whether United Auto's loan was "offered for the express purpose of financing the purchase" of his car.[7]  So we must interpret the phrase "for the express purpose."  If that phrase, as used in the Act, means merely "for the specific purpose," United Auto wins.  If it means "for the sole purpose," Davidson wins.

---

family, or household purposes; payable in 42 installments; and included "finance charges." J.A. 40.

[6] The Department of Defense has promulgated a regulation through notice-and-comment rulemaking related to this exception.  *See* 32 C.F.R. § 232.3(f)(2)(ii), (iii).  But the language the Department used is so much like the exception's statutory language that it is irrelevant to our analysis.  *See* 32 C.F.R. § 232.3(f)(2)(ii), (iii).  For the same reason, even if it were proper to consider any of the Department's non-legislative interpretations of these regulations, they would not be due any deference.  *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2417 n.5 (2019) (noting that an agency receives no deference when it "interprets a rule that parrots the statutory text"); *Carlton & Harris Chiropractic Inc. v. PDR Network, LLC*, 982 F.3d 258, 264 (4th Cir. 2020) ("Interpretive rules 'do not have the force and effect of law and are not accorded that weight in the adjudicatory process.'" (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015)).

[7] Elements one and three are not at issue:  The loan was procured while buying a car and was secured by that car.

B.      Interpreting "for the express purpose"

When we conduct statutory interpretation, our "job is to interpret the words consistent with their 'ordinary meaning . . . at the time Congress enacted the statute.'" *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979) (alteration in original)).  Of course, this means that "we begin with the text." *Sw. Airlines Co. v. Saxon*, 142 S. Ct. 1783, 1789 (2022).  And to appreciate the text, "context often provides invaluable clues to understanding the meaning of words." *United States v. Smith*, 919 F.3d 825, 837 (4th Cir. 2019); *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2607, 2609 (2022) (turning to context when both parties had a "colorable textual basis" for their position).  Here, enriching the phrase "for the express purpose" with § 987(i)(6)'s context shows that it means "for the specific purpose," not "for the sole purpose."

Searching for the plain meaning of a statute's text often starts with reading dictionaries published close in time to when it was enacted.  *See United States v. Ward*, 972 F.3d 364, 370 n.4 (4th Cir. 2020) (noting that dictionaries "require careful use and healthy skepticism").  And here, as is often the case, dictionaries provide some support for both positions.  Some dictionary definitions support Davidson's preferred reading:  that "for the express purpose" means "for the sole purpose." *See, e.g.*, *Express*, Concise Oxford American Dictionary 315 (2006) ("Precisely and specifically identified *to the exclusion of anything else.*" (emphasis added)); *Express*, Encarta Concise English Dictionary 504 (2001) (defining express as "definitely, and *usually exclusively*, intended or specified" (emphasis added)).  Yet not all dictionaries defining "express" demand exclusivity.  Many

7

reflect that the "express purpose" need not be exclusive so long as it is particular or specific. *See, e.g.*, *Express*, Garner's Modern American Usage 434 (3d ed. 2009) (explaining that when used adjectivally, "express" means "specific, definite, and clear"); *Express*, Webster's Third New International Dictionary of the English Language Unabridged 803 (2002) ("specifically designed or chosen for its purpose . . . of a particular or special sort: SPECIFIC (he came for that [express] purpose)"); *Express*, Random House Webster's Unabridged Dictionary 683 (2d ed. 2001) ("special; definite: *We have an express purpose in being here*."). So, as is most often the case, dictionaries cannot answer our question beyond showing us that "the express purpose" need not always be exclusive.

Thus, we must look beyond dictionaries. To decide what "for the express purpose" means in the Act, we must read it in its context.[8] Section 987(i)(6) uses "for the express

---

[8] Davidson argues that we should use two related canons of construction to adopt his narrower view of the exception. Neither applies.

First, while the Supreme Court sometimes gives exceptions narrow readings, exceptions are to be given "a fair reading" unless there are "textual indication[s]" that Congress wanted the exception narrowly read. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). Here there are none.

Second, "provisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor." *Henderson v. Shinseki*, 562 U.S. 428, 441 (2011). This canon applies to resolve statutory ambiguity when it is obvious what interpretation most benefits servicemembers. *See, e.g.*, *id.* (more time to appeal); *Brown v. Gardner*, 513 U.S. 115, 117 (1994) (more injury claims covered); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 n.9 (1991) (jobs held open longer); *Boone v. Lightner*, 319 U.S. 561, 575 (1943) (greater ability to stay proceedings).

Here it is unclear which interpretation of "for the express purpose" most benefits servicemembers. Maybe it is more beneficial to regulate dual-purpose auto loans under the Act as consumer credit. Yet since the Act forbids using a servicemember's car as security for consumer credit, § 10 U.S.C. 987(e)(5), that would bar all servicemembers from taking out secured dual-purpose auto loans. And restricting servicemembers borrowing options in this way might hurt—rather than benefit—them. *See* Amicus Brief (Continued)

purpose" to set a condition. This context informs what we, the reviewing court, ask when applying the exception.

A conditional statement has two parts: a condition and a conclusion. R. B. Steele, *Analysis and Interpretation of Conditional Statements*, 13 Classical J. 354, 354 (1918); *Conditional Sentence*, Garner's Modern American Usage (3d ed. 2009) ("A sentence that states a condition and the consequence or outcome of that condition's occurring."). If you do this (the condition), then you get that (the conclusion). When the condition is met—for our purposes—the conclusion *must* follow. So when we, a reviewing court, are asked to determine whether you get "that," we look to whether you did "this." And if—as here— "this" is really three separate things then we take out a checklist and mark off each time we see evidence you did one of those things. When we hit three marks, you get "that." No matter what else you may have done. *See* James D. McCawley, *Everything that Linguists Have Always Wanted to Know About Logic\* \*but were ashamed to ask* 529 (1980) (showing that in an "if A, then B" conditional statement, if A is satisfied then B follows even if a third variable is introduced).

---

of Seven Current or Former Members of Congress at 19–20. As the exception recognizes, getting secured auto loans benefits servicemembers. So an expansive, rather than narrow, reading of the exception may well be what the canon would suggest.

When it is unclear what interpretation would most benefit servicemembers, it is not our job to weigh the policy consequences and interpret the text to reach our preferred outcome. That method flips our duty on its head. We interpret the text to reach Congress's mandated outcome—regardless of the policy consequences. Faced with no clear path to deciding which interpretation favors servicemembers, we cannot apply the canon. And even were the canon to apply, its subject-matter-based presumption cannot overcome the text and context of the provision. *See Arellano v. McDonough*, 143 S. Ct. 543, 552 (2023); *Fishgold*, 328 U.S. at 285.

Section 987(i)(6) uses "for the express purpose" to set a condition. True, it does not use a classic "if, then" structure. But it lays out three required elements for finding something is not consumer credit. And to see if it applies, we must place those elements on a checklist and mark them off as we find evidence of them in the record. In this case, the critical box that must be checked is whether the Act is offered "for the express purpose" of financing a car purchase. So for our purposes, § 987(i)(6) relevantly reads: "If a loan is given for the express purpose of financing the purchase of a car, then it is not covered by the Act."

And when "for the express purpose" is used in such a conditional statement, it generally means "for the specific purpose."[9] Consider a simple example. Suppose a father says to his daughter: "If you go to the library for the express purpose of reading books, then I will give you $20." The condition is going to the library for the express purpose of reading. The conclusion that follows satisfying that condition is receiving the $20. If his daughter goes to the library to read books, then she is entitled to the $20—even if she also went specifically to pet the librarian's dog. When the father reneges and the daughter sues, our examination is brief: Did you go to the library for the express purpose of reading books? "Yes." End of questioning. We need not query if she went to the library for any

---

[9] On this aspect we apparently agree with the dissent. The dissent quotes our introduction, claiming we read "express" to mean "related." But we use the word "related" there to factually describe the fees Davidson's loan financed. We could just as readily call those fees "other" or "additional." Nothing hinges on that factual characterization. And our analysis is expressly (here we mean explicitly) clear: we—like the dissent—think that when the Act uses "for the express purpose" it means "for the specific purpose." Although, unlike the dissent, we do not think it is limited to the sole purpose.

10

other purpose. The condition is satisfied and is not rendered unsatisfied because she also went to pet the dog. *See id.* No court would uphold the father's default.

But we need not rely on only ordinary-usage hypotheticals to show that "for the express purpose" means for the "specific" and not "sole" purpose when used as part of a condition. The Supreme Court uses it that way too. For example, in *Wooley v. Maynard*, 430 U.S. 705 (1977), the Supreme Court held that if a state requires individuals to display an ideological message on their license plates "for the *express purpose* that it be observed and read by the public" then it violates the First Amendment. *Id.* at 713 (emphasis added). Yet *Wooley* later acknowledged the state had a second purpose for requiring that the message be displayed: allowing law enforcement to identify the plate. *Id.* at 716. Public observation was one of the state's specific purposes. It was not its only one. So express purpose in *Wooley* cannot mean "sole purpose." Likewise, in *California v. Greenwood*, 486 U.S. 35 (1988), defendants' trash was exempted from the Fourth Amendment's coverage since they had "placed their refuse at the curb for the *express purpose* of conveying it to a third party." *Id.* at 40 (emphasis added). The defendants certainly had a second purpose for putting their trash on the curb: getting it out of their house. What mattered to the Court though was that one specific purpose of the defendants' actions was third party conveyance—no matter how many other purposes they had. *See id.* at 41

11

(analogizing to phone numbers voluntarily conveyed to a third party that have the obvious additional purpose of completing a phone call). [10]

Our point is not that these are the only cases to ever use "for the express purpose." Nor that their use of the phrase somehow binds us. It is merely that they underscore what common understanding of language already reveals: when "for the express purpose" is used in a condition, it means "for the specific purpose."[11] It does not mean "for the sole purpose."[12]

Not that "for the express purpose" never means "for the sole purpose." As we have acknowledged, sometimes it does. For instance, when "for the express purpose" is used as

---

[10] Similarly, in *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 458 (1942), the Court explained that if a note is used "for the express purpose of deceiving" then it is financial fraud. *See also Tavenner v. Smoot*, 257 F.3d 401, 407 (4th Cir. 2001) ("[I]f a debtor enters into a transaction with the express purpose of defrauding his creditors . . ."). But it is still fraud even if the note's user also had a second, non-deceptive purpose for using the note. So the Court there used the phrase "for the express purpose" to mean for the specific, but not necessarily sole, purpose. *See also TFWS, Inc. v. Schaefer*, 325 F.3d 234, 236–37 (4th Cir. 2003), (using "for the express purpose" to mean for the "*expressed*" purpose).

[11] In this sense, we decide that the communicative content of the statute is the same whether the speech community is either the courts given that these are statutory definitions or the ordinary public reading the Military Lending Act.

[12] The only federal courts that have considered this precise issue so far have reached the same conclusion: "for the express purpose" in § 987(i)(6) does not mean "sole purpose." *See Juarez v. Drivetime Car Sales Co., LLC*, No. 3:19-CV-1132-BJD-JRK, 2021 WL 2404118, at *3 (M.D. Fla. June 1, 2021) ("The presence of the other add-on items does not alter the Installment Contract's express purpose, i.e., the purchase of the vehicle any more than it would alter the express purpose a patron who enters the grocery store needing milk but who happens to also grab a candy bar during the check-out process."); *Yurth v. Experian Info. Sols., Inc.*, No. CV 22-660, 2022 WL 3588019, at *6 n.6 (E.D. Pa. Aug. 22, 2022) (explaining that financing a service contract along with a car "did not change the [loan's] express purpose").

part of a directive, it generally means "for the sole purpose." Directives tell somebody to do or not do something. *Grammar and Usage*, The Chicago Manual of Style 5.214 (2017).[13] They can be affirmative commands: "use this for that." Often inherent in a directive is a prohibition: you cannot use "this" for anything but "that." As a reviewing court asked to determine whether you complied with the directive, we may need to check not only to see if you used "this" for "that," but also if you used "this" for anything besides "that." So if § 987 gave money to lenders and directed them to give loans to military members "for the express purpose" of financing a car purchase, we may well think lending that money for any other purpose is prohibited. Davidson might win.

To see why, consider our hypothetical father and daughter again. Imagine the father gives his daughter a credit card and tells her, "use this for the express purpose of buying a book." He has used "for the express purpose" within a directive and so likely limited how the card can be used: it must be used to buy a book and only a book. If his daughter then takes that card and buys both a book and a sandwich, the father would be justified in reprimanding her.

But the provision here is not a directive. Our provision doesn't order anyone to do anything. It lays out definitional elements to be checked rather than commands to be followed. Thus, we read "for the express purpose" to mean "for the specific purpose" rather than "for the sole purpose." *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560,

---

[13] Directives and conditional statements are not mutually exclusive. A conditional statement can include a directive as its conclusion: "If this happens, then do that." But directives themselves are not conditions.

13

568 (2012) ("That a definition is broad enough to encompass one sense of a word does not establish, however, that the word is *ordinarily* understood in that sense.").

Davidson claims otherwise, noting that the provision says "*the* express purpose," not "*an* express purpose." This, he says, tells us that "express" in § 987(i)(6) means "sole," not merely "specific." In other words, to qualify for the § 987(i)(6) exception, a loan must have a *single* purpose: financing the purchase of a car. And this argument has some support since the Supreme Court has said that sometimes the "use of the definite article . . . indicates that there is generally only one." *See Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004). *But see NLRB v. Canning*, 573 U.S. 513, 527 (2014) (rejecting that "the word 'the' in 'the recess'" means that "the phrase refers to the single break separating formal sessions of Congress").

Section 987(i)(6)'s use of "the" cannot hold the weight Davidson places on it. Congress has specifically instructed that, when we are performing statutory interpretation, courts should assume that "words importing the singular include and apply to several . . . things," "unless context indicates otherwise." 1 U.S.C. § 1. So we must assume that, when § 987(i)(6) asks whether a loan is offered "for the express purpose" of financing a car purchase, it allows the loan to be made for multiple purposes unless context dictates otherwise. And as already explained, here it does not.

Yet even if we accepted Davidson's argument that "the" in § 987(i)(6) is an affirmatively singular modifier, that would not change our conclusion. Again, § 987(i)(6) places conditions on its application. It lists things that courts must check before excusing a loan from the Military Lending Act's coverage. And there is only one express purpose

14

that courts must check before moving on. "The" express purpose the exception cares about is financing the purchase of a car. It says nothing about other express purposes the loan might have. So Davidson's argument fails.

Once we interpret "express" to mean "specific" and not "sole," the analysis is easy. Section 987(i)(6) says that consumer credit does not include—and thus the Act does not apply to—a loan if it is: (1) "procured in the course of purchasing a car"; (2) "offered for the express purpose of financing the purchase" of that car; and (3) "secured by the car." Placing those requirements on a checklist we ask: Was it procured in the course of purchasing a car? Yes. Was it offered for the specific purpose of financing the purchase of that car? Yes. And was it secured by the car? Yes. Did it also finance GAP protection? We do not care and we do not ask. The conditions have all been satisfied and the conclusion must follow. The loan is exempted from the Act, no matter what else it financed.

*       *       *

A statutory provision must be given the ordinary meaning it had when it was enacted. Relevant dictionaries, carefully considered, sometimes shed light on that ordinary meaning. Yet here dueling dictionaries provide more than one linguistically permissible meaning. So we must dig deeper. Not by following the dissent's well-intentioned descent into purposive spirit. *See Holy Trinity v. United States*, 143 U.S. 457 (1892). But by examining the relevant phrase in its statutory context. This context shows that while "the express purpose" can be used in different senses, it is best read in § 987(i)(6) to mean the specific purpose. This loan was offered for the specific purpose of financing Davidson's

15

car purchase.  And that satisfies § 987(i)(6)'s relevant condition and the Act is inapplicable.

The district court is therefore

*AFFIRMED*.

WILKINSON, Circuit Judge, dissenting:

To help protect the service members who risk their lives for us, Congress passed a statute curtailing profit-gouging at their expense. The Military Lending Act (MLA) was not meant to be a weak law, riddled with exceptions so as to accommodate the interests of lenders. The language was strong and clear: The Act capped annual interest rates at 36 percent, compelled oral and written disclosures, prohibited prepayment fees, and precluded forced arbitration. 10 U.S.C. §§ 987(b)–(e)(7). Through the law, Congress also forbade lenders from taking a service member's car as collateral. *Id.* § 987(e)(5). The sole limitation on the Act's reach is found in a single definitional provision, which exempts two kinds of financing: (1) home mortgages, and (2) vehicle or personal-property loans. *Id.* § 987(i)(6).

Under the auspices of textualism, the majority undermines the Act by blessing hybrid loans and product bundles as exempt. These are financings in which the lender packages *non-exempt* financial products with a vehicle or personal-property loan. By carving out such amalgamations from the MLA, the majority invites lenders to market financial products—that would otherwise be subject to the Act—through an unregulated back door. The end result is to "open a loophole allowing easy evasion of the statutory provision's basic purposes." *Cnty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1474 (2020).

No purposive inquiry, however, is necessary to take exception to the majority's ruling. The present statute is one where text falls in line with purpose. And the text speaks clearly enough: exempt loans must be made for "the express purpose" of financing a car.

17

10 U.S.C. § 987(i)(6). This language, read in the context of the Act, does not refer to an "explicitly stated" or "related" purpose, as the majority lets on. Rather, it refers to a purpose that is specific, precise, and exact—in short, "the express purpose."

The majority's gloss on the MLA could well prove mischievous. That would be regrettable. Unscrupulous lenders are bound to take advantage of the wide-open exemption by strapping new products and add-ons to car loans, at a discreet but sizeable expense to service members. A commensurate cost will thus be dealt to "military readiness," since indebted service members have difficulties deploying abroad, obtaining security clearances, retaining "essential" cars, and maintaining good morale—all reasons why the Defense Department promoted the MLA in the first place. U.S. Dep't of Def., *Report on Predatory Lending Practices Directed at Members of the Armed Forces and their Dependents* 16, 39, 42–43, 53 (2006). Because the majority leaves the members of our Armed Services vulnerable where Congress intended protection, I respectfully dissent.

## I.

To start, the words of the MLA's vehicle-loan exception are most "sensibly read narrowly." *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731–32 (1995) (internal quotation marks omitted). While it is true that statutory exceptions should, as a general matter, be "read fairly, not narrowly," *HollyFrontier Cheyenne Ref., LLC v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2181 (2021), fairness can compel a narrow reading given "textual" cues in the statute, *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). For "[i]t is a fundamental canon of statutory construction" that courts must look to the "overall statutory scheme" when examining individual provisions.

18

*Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (internal quotation marks omitted). A court should only interpret a statute as facilitating its own circumvention when "compelled by the language" to do so. *S.E.C. v. Edwards*, 540 U.S. 389, 395 (2004). For instance, courts have construed the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et. seq.*, "broadly" in light of the statute's manifest aim to "provide protection for the consumer." *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 245 (4th Cir. 2019) (internal quotation marks omitted). For statutes such as TILA, a fair reading requires that exemptions be "given a narrow compass." *E.g.*, *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989).

The MLA, for all the reasons United Auto Credit Corporation wishes to avoid it, is one such statute. Just like TILA, it seeks to shield consumers from financial harm. The text of the Act is replete with absolute proscriptions: "[a] creditor . . . may not," 10 U.S.C. § 987(b); "[s]tates shall not," *id.* § 987(d)(2); "[i]t shall be unlawful for any creditor to," *id.* § 987(e); and so forth. Additionally, the MLA preempts state and federal laws, but only to the extent those laws do not *add* "protection" to service members. *Id.* § 987(d)(1). Furthermore, the Act's remedial measures are robust. The Act creates a private right of action, authorizing suit for actual damages "not less than $500 for each violation," punitive damages, equitable relief, and attorney's fees. *Id.* § 987(f)(5)(A)–(B). Violations of the Act render a loan void from inception. *Id.* § 987(f)(3).

Altogether, the Military Lending Act does not evince the sort of timid legislation drafted by "lawmakers tread[ing] in areas fraught with competing social demands where

19

everyone agrees trade-offs are required." *BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1539 (2021). To the contrary, the Act's provisions forcefully intercede in the relationships between private lenders and service members. The MLA regulates nearly all types of "consumer credit"—from pay-day loans to margin lines to credit-card debt—no matter the interest rate. *Id.* § 987(a). In short, the MLA fully occupies the field of lending to service members, with only two exceptions: (1) home mortgages, and (2) vehicle or personal-property loans. 10 U.S.C. § 987(i)(6).

In light of the MLA's overall scheme, the vehicle-loan exception should not be construed broadly. Given multiple reasonable interpretations, a court must choose that "which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and the general purposes that Congress manifested." *Comm'r v. Engle*, 464 U.S. 206, 217 (1984). The majority strays far from a "harmonious" reading, however, by privileging an interpretation that permits lenders to piggyback virtually any financial product onto an exempt vehicle loan.

## II.

Even read in isolation, the text of the vehicle-loan exception cannot support the majority's view. Congress articulated the exemption as encompassing: (1) "a loan procured in the course of purchasing a car," (2) "when that loan is offered for the express purpose of financing the purchase, and (3) "is secured by the car . . . procured." 10 U.S.C. § 987(i)(6). The parties do not dispute that Davidson's loan satisfied the first and third elements of the exemption. Instead, Davidson focuses his entire appeal on the second element, arguing that United Auto's loan was not "offered for the express purpose of financing" his vehicle

20

purchase. United Auto could not have *only* that "express purpose," Davidson alleges, since its $14,698.24 loan also financed a $250 processing fee and $395 in Guaranteed Asset Protection (GAP) coverage. Appellant Br. 17; *see* J.A. 41.

Evaluating Davidson's argument requires an understanding of the vehicle-loan exception's second element. The parties collectively supply three possible interpretations. The first and broadest is that an "express" purpose is the lender's *explicitly stated* purpose. *See* Appellee Br. 10. A second, narrower interpretation—adopted by the majority and the district court—intuits that any non-car charges must at least be *related* to the car purchase. *See* J.A. 55. Finally, the third and narrowest interpretation understands "the express purpose" to mean the lender's *precise and exact* purpose. *See* Appellant Br. 20. Whether explicitly stated or not, that purpose is the one manifestly held by the lender.

As discussed below, the first and second interpretations are implausible: the first because it brushes against the brink of absurdity, and the second because it is untethered from the statutory text. These two interpretations also suffer from redundancy and administrability issues. Thus, only the third interpretation is left standing. The majority consequently errs in not applying the most natural reading of the vehicle-loan exception. While the majority devotes considerable effort to parsing the "directive" and "conditional" uses of *express purpose*, Majority Op. at 10–13, this distinction at best only helps to identify which of the term's three meanings, mentioned above, should apply. But the answer is not close. The language of "*the express purpose of financing the purchase*" means what it most reasonably appears to mean: that United Auto transgressed the limits

of the vehicle-loan exception when it financed add-ons beyond the express purpose of Davidson's purchase of a car.

## A.

Under United Auto's preferred interpretation, a loan qualifies for the vehicle-loan exception when the corresponding contract "states, on its face, that [its] purpose . . . is the purchase of vehicle." Appellee Br. 10. This position is not without support. The word *express* can mean "[c]learly and unmistakably communicated; stated with directness and clarity." Black's Law Dictionary 507 (10th ed. 2015)); *see also* Random House Dictionary of the English Language 683 (2d ed. 1987) ("clearly indicated; distinctly stated; definite; explicit; plain"). United Auto's "express" purpose could hence be understood as its *explicitly stated* purpose, in contrast to an implied purpose. The vehicle-loan exception, read in this manner, would encompass United Auto's loan to Davidson because the relevant contract articulated a "purpose" of "financing the purchase" of a car. 10 U.S.C. § 987(i)(6).

United Auto's reading, however, runs quickly into problems. The first is that it renders the second element of the vehicle-loan exception "redundant or largely superfluous." *Colautti v. Franklin*, 439 U.S. 379, 392 (1979). From its first element, the exception is already limited to loans "procured in the course of purchasing a car." 10 U.S.C. § 987(i)(6). In the document-laden world of lending, it is doubtful that any loan procured in such a manner would not also state that it was for a vehicle purchase. Hence the "explicit" reading of *express* renders wholly redundant the second element of the vehicle-loan exception, violating "the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative." *Colautti*, 439 U.S. at 392.

22

An even greater problem, moreover, is that the reading "simultaneously creates a massive loophole in [a] scheme that Congress established." *Cnty. of Maui*, 140 S. Ct. at 1476. It is hard to believe that Congress would create an exemption permitting lenders to vitiate the MLA merely by *stating* its purpose. Yet under United Auto's reading, a lender could qualify for the exemption by simply stamping the disclaimer—*"This loan is offered to finance the purchase of a car."*—on any loan contract. Through what one might call "artful labeling," a lender could thus saddle a car loan with any and all financial products, while remaining immune to the MLA's strictures. Payday loans, balloon payments, and prepayment fees could all make a comeback under this guise. There is no reason to suspect that Congress regulated the marketing of financial products to service members, only to allow them to be smuggled in through a vehicle-loan back door. "The absurdity of such an interpretation is obvious enough." *Cnty. of Maui*, 140 S. Ct. at 1476. The statute cannot be read to pronounce its own demise.

## B.

The second theory of the vehicle-loan exception calls for assessing whether add-on charges are "inextricably tied to," "typical of," or "obviously related to" a vehicle purchase. Appellee Br. 2–3, 17–26. Applying this interpretation, the district court concluded that United Auto's loan to Davidson qualified for the MLA exemption since "none of the . . . charges at issue" were "*unrelated* to the purchase of the motor vehicle." J.A. 55 (emphasis added). Although this theory does not raise the specter of absurdity, it too is fatally implausible on account of being itself *unrelated* to the statutory text.

23

As an initial matter, the words "inextricably tied," "typical," and "related" are nowhere to be found in the vehicle-loan exception. The majority just plunks them in there. While the word *express* does have several meanings, none of them is equivalent to "related." *See, e.g.*, Merriam-Webster's Collegiate Dictionary 442 (11th ed. 2003). The position taken by the district court may or may not be reasonable as a matter of policy, but it is not what Congress drafted. The majority flatly transforms the statute's finite and focused language into something that is obscure and loose. By relying on a textually unanchored allowance for "related charges," Majority Op. at 3, the majority betrays the textualist flag under which it sails.[1]

A second problem with the "related" theory is the statutory language: "financing the purchase" of a car. While the majority reads the vehicle-loan exception as covering bundles with GAP coverage, the statute states that loans that qualify for the exemption must finance *the purchase of a car*. By approving bundled loans, the majority inserts a "partly financing" caveat into the text that is simply not there.

United Auto argues that this second reading may preserve the opportunity for service members to purchase some financial products "at cost savings." Appellee Br. 3. But while this is a fine argument to make at a legislative hearing, it is not up to this court to adopt what lenders failed to get Congress to include in the MLA.

---

[1] The majority also claims that "related to" could just as easily mean "other" or "additional" or, in all events, not limited to the "sole purpose." *See* Majority Op. at 10 n.9. What exactly it is limited to, the majority does not say. Once again, this open-endedness strays far from the term "express purpose" set forth in the statutory text.

24

The majority might wish to entertain the possibility that Congress knew what it was doing. For even if it were permissible to depart from the statutory text, the "related" theory would still invite problems. If GAP coverage is *related* to the purchase of a car, as United Auto contends, are not pre-paid service contracts too? How about a year's supply of car washes, a parking spot, or cross-country vehicle transportation services? When unscrupulous lenders inevitably test the theory's limits, there will be no compass to follow. The majority somehow expects courts to make fine-toothed distinctions between charges that are "related" to a car purchase and those that are not. Parsing add-on from add-on would be a judiciary-wide enterprise, undoubtedly generating different tests by different courts. The vague modifiers of "related" and "inextricably tied" are likely to create circuit splits, bedeviling district courts and lenders alike. One reason to stick to "the meaning of a statute's text," indeed, is to avert these "nebulous inquiries." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2220 (2020) (Thomas, J., concurring in part).

C.

Because neither competing understanding of the vehicle-loan exception is remotely plausible, that leaves Davidson's interpretation. It seems right to interpret *express purpose*—according to its idiomatic meaning—as a specific, deliberate, and total purpose. Not only does such a reading provide the narrowest answer, thus keeping with the MLA's "overall statutory scheme." *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019) (internal quotation marks omitted). It also most faithfully construes the plain text.

The idiomatic meaning—when "express" is combined with the word "purpose"— is documented in several leading dictionaries. *See, e.g.*, Random House Dictionary of the

25

English Language 683 (2d ed. 1987) ("special; definite: *We have an express purpose in being here.*"); Merriam-Webster's Collegiate Dictionary 442 (11th ed. 2003) ("exact," "precise," or "specific": "for that *express* purpose"); Collins English Dictionary 582 (10th ed. 2009) ("done or planned for a definite reason or goal; particular: *an express purpose*"); American Heritage Dictionary 627 (4th ed. 2006) ("[p]articular; specific"). The sense of "express purpose" captured by these definitions is a purpose that is "special," "definite," "exact," "precise," "particular," and "specific." These terms do not denote a partial or approximate purpose, or even a predominant purpose. *See, e.g.*, Collins English Dictionary 574, 1205 (10th ed. 2009) ("exact: precise, as opposed to approximate; neither more nor less"; "particular: of or belonging to a single or specific person, thing, category, etc."). An exact and particular purpose is the exhaustive purpose. Just as an *explicit* purpose can be distinguished from an *implied* purpose, the idiomatic "express purpose" may be contrasted with a purpose that is hazy, tentative, or incomplete.

The vehicle-loan exception is illustrative. The text exempts loans "offered for the express purpose of financing the purchase" of a car. 10 U.S.C. § 987(i)(6). If *express purpose* is given its idiomatic meaning, then the second element of the exception requires that United Auto had the specific and precise intention of offering Davidson a loan so that he could finance the purchase of a car. This reading remedies the surplusage problem, as it trains the second element of the vehicle-loan exception on the lender's conscious intention—not on the label stamped onto the loan contract. The express purpose need not be stated to be unmistakable. When one goes to a baseball game, he need not announce his

26

intention. He simply walks into the stadium with the express purpose of watching the contest.

Under the idiomatic reading of "express purpose," Davidson has stated a plausible claim for relief. Drawing "all reasonable inferences in [his] favor," *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012), United Auto's loan did not qualify for the vehicle-loan exception because the lender's *express purpose* went beyond facilitating Davidson's purchase of a car. Regardless of United Auto's stated or explicit purposes, its specific and exact purpose exceeded that of financing a car purchase. GAP coverage, which provides loan relief to car buyers in the event their vehicle is totaled or stolen, is neither part of a "car" nor part of its "purchase." Davidson's GAP coverage will not come into play, if ever, until his car is totaled or stolen—perhaps many years after his 2018 purchase. *See* Va. Code Ann. § 38.2-6400.

And a car may straightforwardly be purchased without GAP coverage. Indeed "many lenders and dealerships did not sell GAP" at all from late 2017 until 2020. Br. for Am. Fin. Serv. Ass'n *et al.* 19. Virginia law, furthermore, actually prohibits conditioning the sale of a car on the purchase of GAP. Va. Code Ann. § 38.2-6401. By claiming that United Auto financed GAP coverage, then, Davidson has adequately pled that the lender did not have the precise intention of facilitating his car purchase. To the contrary, his complaint alleged that United Auto deliberately loaned him funds to buy an optional, unnecessary item of no immediate use. As a result, Davidson has set forth "sufficient factual matter" to survive dismissal. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

27

This proper reading of the vehicle-loan exception does not prevent lenders from continuing to finance GAP coverage for service members like Davidson. No prohibition on GAP or related products is found among the MLA's "limitations." 10 U.S.C. § 987(e). Lenders may still extend funds for the purchase of GAP. All the MLA demands is that lenders, when doing so, abide by the disclosures and rules that Congress set in place for service members' protection.

While United Auto makes the policy argument that the idiomatic reading would prevent service members from obtaining "leather seats" or "new wheels," Oral Arg. at 40:10–44, its concerns are overstated. Leather seats and wheels, because they form part of the "car" itself, can be financed under the idiomatic interpretation of *express purpose*. "Sales taxes" are likewise eligible for financing, notwithstanding United Auto's alarm, Appellee Br. 3, because they are part of a car's purchase. It could be a difficult undertaking "to obtain" a car without paying the requisite tax. Merriam-Webster's Collegiate Dictionary 1010 (11th ed. 2003) ("*purchase*: to obtain by paying money or its equivalent"). Imagine ordering a burger and fries, disbursing the exact change for those items, and then pausing before paying any sales tax. The cashier would be befuddled to learn that the "purchase" had already been completed.

It is true that closer calls remain. An extended warranty, for instance, is not physically part of a car. At the same time, dealerships may offer an extended warranty simply to reassure potential buyers that a car is in good condition, thereby greasing the sale. Consumers may hesitate, indeed, to purchase an expensive product when an extended warranty is not offered as a matter of a course. *See* V. Padmanabhan, *Extended Warranties*,

28

*in Product Warranty Handbook* 439, 441 (Wallace R. Blischke & D. N. Prabhakar Murthy eds., 1996) ("It is also likely that manufacturer-backed [extended warranties] are viewed by consumers as providing incentives for a firm to invest in quality because the reputation of the manufacturer is at stake."). The financing of an extended warranty, hence, does not imply—in the same way financing GAP coverage does—that the lender's precise purpose went beyond facilitating a car purchase. If anything, the warranty hypothetical makes clear that the idiomatic reading is vastly more workable than the atextual "related" test proposed as an alternative.

At bottom, there is no need to resort to two implausible interpretations of the vehicle-loan exception when a textually faithful third interpretation is before us in plain sight. That interpretation gives a cogent and crystallized meaning to the words, *express purpose*, ensuring that exemption-worthy lenders have acted with the exact and deliberate purpose of financing a car purchase. Regardless of the purpose stated on loan documents, lenders can qualify for the exemption insofar as they act for that purpose and that purpose only. In this respect, the proper reading of the vehicle-loan exception becomes a laser in its focus, and one that is of no avail to United Auto on its motion to dismiss.

III.

The Department of Defense "strongly concurs" in the government's amicus brief, which bears strong resemblance to Davidson's own view. Br. for United States 2. That brief reasoned that a "[h]ybrid loan"—financing a car and standalone financial products—cannot qualify for the vehicle-loan exception. Br. for United States 1. "Common parlance," the government contends, "confirms that the purchase of a bundle of disparate products is

29

not the same as 'the purchase' of a specific product such as 'a car or other personal property.'" Br. for United States 15.

The Department's views may only be persuasive, but they merit consideration here. The Department significantly influenced the MLA's design and lobbied for its enactment. *See* U.S. Dep't of Def., *Report on Predatory Lending Practices Directed at Members of the Armed Forces and their Dependents* 50–53 (2006) [hereinafter Dep't of Def.]. The Department has also been charged by Congress with the Act's implementation. 10 U.S.C. § 987(h). Its familiarity with the MLA, its objectives, and its challenges underscore the incorrectness of the atextual interpretation the majority embraces.

The majority's departure from the statute carries real consequences. As one military representative testified to Congress, "automobile dealerships acting as loan brokers [can] do far more damage" than even "payday lenders." *Soldiers as Consumers: Predatory and Unfair Business Practices Harming the Mil. Cmty*, *Hearing before the S. Comm. on Com., Sci., and Transp.*, 113th Cong. 37 (2013) (statement of Dwain Alexander II, Senior Civilian Attorney, U.S. Navy). By saddling car loans with ancillary fees just "to add money to the contract," lenders turn service members into "the equivalent of a money delivery system for the automobile industry," the representative explained. *Id.* at 37–38. The Defense Department agreed, citing "unscrupulous automobile financing" as a main contributor to the financial issues of service members. Dep't of Def., *supra*, at 39.

That lenders seek to take advantage of soldiers and sailors is hardly surprising. Those who serve in our country's military tend to be young, "without the guidance or assistance of family," and lacking in financial experience, all while receiving "perhaps their

30

first significant paycheck." *Id.* at 10. Additionally, service members' creditworthiness remains high, in part because military policy "explicitly" requires them to honor debts. *Id.* Not always perceiving the "financial ramifications" or "alternatives" to a loan, *id.* at 22, service members make "particularly attractive targets" for unscrupulous lenders. *A Review of the Department of Defense's Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents: Hearing Before the S. Comm. on Banking, Hous. & Urban Aff.*, 109th Cong. 1 (2006) (statement of Sen. Richard C. Shelby, Chairman, S. Comm. on Banking, Hous. & Urban Affairs).

It is a form of stealth financing for lenders to impose higher prices on service members—who just need a car—through add-ons on top of add-ons. The MLA was supposed to forestall this practice. But the majority gives it new life. While soldiers, sailors, and airmen may be only vaguely aware of what hits them, they are not the only casualties of the majority's decision. When service members engage in risky behavior to patch a financial hole, Dep't of Def., *supra*, at 42–43, fail to access a security clearance due to indebtedness, *id.* at 39, or forfeit a car needed for "essential transportation" to a lender, *id.* at 16, the country's preparedness is at greater risk. Service members' financial plight, the Defense Department has concluded, "undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all volunteer fighting force." *Id.* at 53.

IV.

I catch in conclusion the faint whiff of *Lochner* in the majority decision. *See Lochner v. New York*, 198 U.S. 45, 57 (1905) (abrogating a statutory limit on bakers'

31

working hours "for interfering with the liberty of person or the right of free contract"). Freedom of contract is a precious thing, but enacted law trumps even that. Or so I was taught. And when, as here, Congress perceives stark inequalities in the bargaining parties, it is constitutionally entitled to supply a corrective.

Congress did so in the Military Lending Act, only to be rebuffed by the court. The statutory text often lies in the way of judicially preferred results, but this is, or should be, of no moment. "If the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be abandoned." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 483 (1934). That same injunction holds true for statutes. The statutory text was not upheld here, and I respectfully note my dissent.